RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 26a0195p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

DR. AMY DICHIARA,

        *Plaintiff-Appellant*,

    *v.*

SUMMIT MEDICAL GROUP, INC.; ST. ELIZABETH MEDICAL CENTER, INC.; DR. ROBERT PRICHARD; GARREN COLVIN,

        *Defendants-Appellees*.

No. 25-5396

─────────────────

Appeal from the United States District Court for the Eastern District of Kentucky at Covington.
No. 2:22-cv-00111—David L. Bunning, District Judge.

Argued: March 19, 2026

Decided and Filed: July 13, 2026

Before: SUTTON, Chief Judge; LARSEN and DAVIS, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:** Christopher Wiest, CHRIS WIEST, ATTY AT LAW, PLLC, Covington, Kentucky, for Appellant. Michael J. Enzweiler, DRESSMAN BENZINGER LAVELLE, Covington, Kentucky, for Appellees. **ON BRIEF:** Christopher Wiest, Theodore J. Roberts, CHRIS WIEST, ATTY AT LAW, PLLC, Covington, Kentucky, Thomas B. Bruns, BRUNS CONNELL VOLLMAR & ARMSTRONG, Cincinnati, Ohio, for Appellant. Michael J. Enzweiler, Mark D. Guilfoyle, Nicholas C. Birkenhauer, DRESSMAN BENZINGER LAVELLE, Covington, Kentucky, for Appellees.

---

**OPINION**

---

LARSEN, Circuit Judge.   Amy DiChiara was working as physician when her employer determined that its employees must either vaccinate against COVID-19 or get an exemption. DiChiara advocated against this policy and was eventually terminated.  She sued her employer for retaliation under Title VII and the Americans with Disabilities Act; she also brought state claims for retaliation, discharge against public policy, breach of contract, and tortious interference with contract.  The district court granted summary judgment to the defendants and found that DiChiara's claims failed as a matter of law.  DiChiara has not shown that her termination violated state or federal law, so we AFFIRM.

I.

Dr. Amy DiChiara worked as a gastroenterologist for St. Elizabeth Physicians (SEP), a subsidiary of St. Elizabeth Healthcare.  On August 5, 2021, SEP and St. Elizabeth announced a COVID-19 vaccination policy that required all employees to be vaccinated against COVID-19 on or before October 1, 2021, unless they were granted "an exemption for medical or sincerely-held religious reasons." R. 50-2, Vaccine Policy, PageID 2726.  DiChiara had both scientific and religious objections to the policy.  While deciding how to approach the situation, DiChiara saw a Facebook post from Eric Deters, a representative of Deters Law.  Deters had been using social media to advertise a litigation plan to fight against the vaccination policies at St. Elizabeth and other area hospitals.  Deters was disbarred at the time of his communication with DiChiara, although DiChiara testified that she thought Deters was a practicing attorney.

Two days after SEP and St. Elizabeth announced the vaccine policy, DiChiara emailed Deters seeking advice on her "planned response" to the policy.  R. 50-4, Email, PageID 2735. She explained that she wanted to send the CEOs of St. Elizabeth and SEP her "medical [and] scientific" concerns about the vaccine and request a face-to-face meeting.  *Id.*  She did not plan to mention "any religious concerns" but said that if the hospital failed to change its vaccine policy, she planned to submit a religious exemption.  *Id.*  DiChiara wanted advice because, while

she "believe[d]" that "medical and scientific concerns" and "personal convictions" could exist at the same time, she did not want SEP to question "the legitimacy of [her] religious exemption request" if she chose to focus on her scientific concerns first. *Id.* Deters replied, "I think it's great. I'll help you too." *Id.*

Deters then began to include DiChiara in group-email communications about potential litigation, eventually asking recipients to sign a client contract for a class action. DiChiara did not sign the contract, nor did she engage Deters Law to represent her. Two weeks later, on August 23, Deters Law sued SEP and St. Elizabeth, contesting the vaccination policy on behalf of their employees. The 111-page complaint contained many legal theories but did not mention discrimination or retaliation under the Americans with Disabilities Act (ADA) or Title VII. DiChiara was not a party to this lawsuit. On August 29, the plaintiffs voluntarily dismissed the case, indicating an intent to refile at a later date. *See Beckerich v. St. Elizabeth Med. Ctr., Inc.*, No. 2:21-cv-100-DLB-EBA (E.D. Ky. Aug. 29, 2021), Dkt. No. 13.

Meanwhile, DiChiara began to put her vaccine-response plan in motion. She first reached out to Garren Colvin, President and CEO of St. Elizabeth Healthcare, and Robert Prichard, President and CEO of SEP. DiChiara asked for a meeting to discuss her concerns about the vaccine. DiChiara, Colvin, and Prichard had an hour-long meeting on August 16 that DiChiara later described as "very pleasant and courteous." R. 50-22, Email, PageID 2913. DiChiara "intentionally did not talk about anything personal" and instead focused on her scientific concerns with the vaccines. R. 50, DiChiara Dep., PageID 2529. Her main concern was that the vaccines did not actually prevent the spread of COVID, and she had prepared a 27-page document explaining her concerns using scientific research. DiChiara shared this document with Colvin and Prichard and asked them to share it with hospital leadership, which Prichard then did.

Later that week, DiChiara followed up with Colvin and Prichard individually, asking if either had further thoughts on her letter. Colvin did not reply, but Prichard told DiChiara that they "d[id] not plan to alter [their] approach at this time" and they would "continue to monitor new developments as they occur." R. 50-18, Email, PageID 2897. Disappointed in the response, DiChiara next planned a meeting with other physicians and medical staff to discuss the vaccine

policy.  Afterward, she arranged for a petition and a summary of the group's medical concerns and proposed policy changes to be circulated to hospital leadership.

As DiChiara prepared to circulate the petition, she emailed Deters.  This August 31 email updated him on her communications with SEP over the preceding few weeks and expressed frustration that Prichard and Colvin had not responded to her entreaties with a policy change.  She further noted that she would be "applying for a religious exemption" and that she "assume[d] [she] w[ould] get it granted."  R. 50-22, Email, PageID 2914.  DiChiara shared a draft of the petition letter without any signatories but emphasized that she "d[idn't] want [Deters] to publicly share [her] letter" because she wanted to follow a "restrained approach" rather than "take [SEP] before the . . . public."  *Id*.  Her main goal was to let people know that there were "doctors out there that oppose this mandate."  *Id*. at 2915.

The email told Deters that DiChiara would "forward [him] a few more emails," including her "follow-up email to . . . Prichard and his response" and "[her] follow-up email to [Colvin]."  *Id*.  She then forwarded Deters those exchanges, as well as a third "[b]onus email" about the mRNA vaccine, which she said Deters could "[f]eel free to share widely."  R. 50-25, Email, PageID 2923.  Lastly, she forwarded an email exchange between SEP and a physician who contested SEP's characterization of FDA approval for a COVID vaccine.  DiChiara considered SEP's email about FDA approval to be "outright misleading."  R. 50-26, Email, PageID 2924.

After explaining these email exchanges to Deters, DiChiara once again repeated, "please don't share all these details publicly."  R. 50-22, Email, PageID 2915.  Although she wanted Deters to "store this [information] as ammunition for [his] case," she wanted to help only "quietly for now."  *Id*. at 2915–17.  At the time, Deters Law had no active lawsuit against St. Elizabeth or SEP because the previous lawsuit had been dismissed.

On the evening of August 31, a group of medical staff sent the petition signed by forty-seven medical professionals to the SEP board.  The email contained an edited version of the scientific research DiChiara had already sent to Prichard and Colvin, as well as a cover letter summarizing the group's concerns about the vaccine.  Within 24 hours, Deters sent out a group email that included the names of all the physicians who had signed the petition.  DiChiara did not

know how Deters got the names but reminded Deters that she wanted to work internally without publicizing confidential information.  DiChiara then emailed the letter's signatories to notify them that the letter and their names had been shared publicly.

On September 3, Deters Law filed another lawsuit against SEP and St. Elizabeth.  This lawsuit contained many of the same claims as the previous lawsuit, but it included new claims under the ADA and Title VII.  The complaint also included new exhibits—specifically, Deters Law attached the four emails that DiChiara had forwarded to Eric Deters.  DiChiara was very upset.  She tried to call Deters and left a voicemail when he didn't pick up the phone.  She also sent him an urgent email demanding that he remove the emails from his exhibits.  But DiChiara never heard from Deters again on the subject.

Two days later, DiChiara emailed an apology to Colvin and Prichard.  She addressed the new lawsuit directly and stated she was "shocked and angered" that copies of documents, "including private email exchanges you and I have had from previous weeks," had been shared publicly.  R. 50-36, Letter, PageID 3046.  DiChiara further stated that "[i]t was never [her] intent to seek litigation" and that she "never asked Deters Law to represent [her], nor did [she] sign any affidavits for Deters Law."  *Id.* at 3047.  Prichard replied saying he was "very disappointed and upset that [DiChiara] would share [their] private conversations and emails with Mr. Deters."  R. 50-37, Email, PageID 3048.  He then requested that DiChiara send him "any and all communications" she had with Deters Law.  *Id.*  After reaching out to counsel, DiChiara ultimately decided not to share any additional emails with Prichard because she still wanted Deters to retract the documents and did not want to prejudice that endeavor.

Meanwhile, the September 15 vaccine exemption deadline loomed.  On September 13, DiChiara applied for a religious exemption.  SEP granted her request on September 17, and DiChiara received notification of approval on September 20.  By October 1, 100% of SEP staff had either been vaccinated or had received an exemption.

Then, on October 4, SEP fired DiChiara.  The termination letter listed misappropriation of company property, violations of company policy, disruptive and unprofessional conduct, and breach of loyalty as "for-cause" reasons for termination.  And because SEP deemed DiChiara's

termination "for-cause," it also enforced a one-year contractual non-compete provision against her.

After exhausting administrative procedures, DiChiara filed suit in federal court against SEP, St. Elizabeth, Prichard, and Colvin. She brought federal claims for Title VII and ADA retaliation and Title VII religious accommodation,[1] as well as state claims for retaliation and conspiracy, discharge against public policy, breach of contract, tortious interference, and declaratory relief from her noncompete clause. Both DiChiara and the defendants moved for summary judgment. The district court granted the defendants' motion on all claims. DiChiara now appeals.

## II.

We review de novo the district court's grant of summary judgment. *Franklin Am. Mortg. Co. v. Univ. Nat'l Bank of Lawrence*, 910 F.3d 270, 275 (6th Cir. 2018). Summary judgment is appropriate when the movant shows that "'there is no genuine issue as to any material fact' and 'the movant is entitled to judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(a)). We view the facts presented in the "light most favorable to the party against whom summary judgment was entered." *Id.* (citation omitted). And for DiChiara's state claims, "we apply the substantive law of the forum state." *Jones v. City of Elyria*, 947 F.3d 905, 912 (6th Cir. 2020).

## A.

We turn first to DiChiara's retaliation claims under Title VII and the ADA. Both statutes prevent retaliation against an individual who has "opposed any [unlawful] act or practice" or "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a) (ADA); *accord id.* § 2000e-3(a) (Title VII). The parties agree that retaliation claims under Title VII and the ADA should be analyzed in the same manner. *See Poe v. Memphis Light, Gas & Water Div.*, 201 F.3d 441, at *4 n.3 (6th Cir. 1999) (table) ("The analysis for a retaliation claim under Title VII and the ADA is the same."); *Kelly v. Graphic Packaging Int'l, LLC*, 2025 WL 573766, at *3 (6th Cir. Feb. 21, 2025) (same).

---

[1]DiChiara later voluntarily withdrew her failure to accommodate claim.

To establish a prima facie case of retaliation, DiChiara must show that she (1) "engaged in protected activity," (2) her "employer knew of the exercise of the protected right," (3) her employer took an "adverse employment action" against her, and (4) "there was a causal connection between protected activity and the adverse employment action." *Niswander v. Cincinnati Ins. Co.*, 529 F.3d 714, 720 (6th Cir. 2008). If DiChiara presents sufficient evidence to show prima facie retaliation, her employer then must produce "evidence of a legitimate, nondiscriminatory reason for its actions." *Id.* The burden then shifts back to DiChiara to show that the proffered reasons were pretextual.[2] *Id.*

We start and end by analyzing protected activity. Title VII and the ADA provide two distinct ways that an employee can engage in protected activity. First, an employee could "participate[] in any manner" in a Title VII or ADA investigation, proceeding, or hearing. 42 U.S.C. § 2000e-3(a); *id.* § 12203(a). Second, an employee could "oppose[]" unlawful discrimination. *Id.* The distinction between the opposition clause and the participation clause "is significant because federal courts have generally granted less protection for opposition than for participation in enforcement proceedings." *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1312 (6th Cir. 1989). But neither clause covers DiChiara's conduct in this case.

*Participation.* DiChiara argues that she participated in a Title VII proceeding because she "confidentially gave employer documents to a law firm . . . to help build Title VII and ADA claims."[3] Appellant Br. at 25 (citation modified). This sort of indirect assistance does not qualify as protected conduct under the participation clause on the facts of this case.

The participation clause "protect[s] the employee who utilizes the tools provided by Congress to protect his rights." *Niswander*, 529 F.3d at 722 (quoting *Hashimoto v. Dalton*, 118 F.3d 671, 680 (9th Cir. 1997)). "[O]nce activity in question is found to be within the scope of the participation clause, the employee is generally protected from retaliation." *Johnson v. Univ.*

---

[2]Alternatively, a plaintiff may present direct evidence of retaliation to avoid the burden-shifting framework. *See Abbott v. Crown Motor Co.*, 348 F.3d 537, 542 (6th Cir. 2003). Here, the district court found that DiChiara did not present any direct evidence of retaliation. DiChiara's briefing failed to contest that conclusion.

[3]DiChiara frames her conduct as part of a proceeding rather than a hearing or an investigation. *See* Oral Arg. at 2:16–30. We accept her framing for purposes of this appeal.

*of Cincinnati*, 215 F.3d 561, 582 (6th Cir. 2000) (quoting *Booker*, 879 F.2d at 1312).   The protection persists even if "[an] employee is wrong on the merits of the charge" or "the contents of the charge are malicious or defamatory as well as wrong."  *Id.* (citation modified).

Such broad protection necessitates a clear starting point.  We have previously held that participation must be "direct"—it covers activities like being a party to a lawsuit, providing deposition testimony, or responding to a subpoena.  *See Aldrich v. Rural Health Servs. Consortium, Inc.*, 579 F. App'x 335, 337 (6th Cir. 2014);[4] *see also Niswander*, 529 F.3d at 721. By contrast, we have held that "any activity by the employee prior to the instigation of statutory proceedings is to be considered pursuant to the opposition clause" rather than the participation clause.  *Booker*, 879 F.2d at 1313.  To hold otherwise, we explained, "would blur the distinction between opposition to unlawful practices and participation in proceedings."  *Id.* at 1313 n.3.

DiChiara was not a party to any lawsuit and her own statements show that she never intended to "seek litigation," that she "never asked Deters Law to represent [her]," and that she never "sign[ed] any affidavits for Deters Law."  R. 50-36, Email, PageID 3047.  Her attorney also represented that she would "vigorously fight any subpoena" from Deters Law, and DiChiara was ultimately successful in that endeavor.  R. 44-46, Email, PageID 1001.  DiChiara does not dispute these facts.  Instead, she argues that her emails to Eric Deters were protected activity because she sent them as "ammunition" to help build Deters's case.  R. 50-22, Email, PageID 2917.  But DiChiara's pre-lawsuit emails constitute indirect assistance at best.  That's not enough.

Take *Aldrich* as an example.  In that case, an employer had been sued for employment discrimination.  *Aldrich*, 579 F. App'x at 336.  The employer then instructed an employee, Aldrich, to destroy any emails that could have been relevant to the underlying discrimination suit.  *Id*.  Instead of following instructions, Aldrich began forwarding emails to her personal account because she was worried about her job security and believed that her employer was

---

[4]Although *Aldrich* involved the Age Discrimination in Employment Act (ADEA), it examined Title VII caselaw to reach its result.  *See id*. at 337.  "Title VII's anti-retaliation provision is similar in relevant respects to the ADEA's anti-retaliation provision," and we look to cases construing both statutes "as a source of authority."  *Fox v. Eagle Distrib. Co.*, 510 F.3d 587, 591 (6th Cir. 2007).

destroying evidence relevant to her former co-worker's lawsuit. *Id.* When Aldrich was eventually fired, she sued her employer and alleged that she was fired for "refusing to destroy evidence related to the . . . lawsuit." *Id.* Even though there was an ongoing lawsuit, we held that her activity did not involve participation because the employee "was not directly involved in any litigation, or responding to any request from [the other employee's] attorneys, when she forwarded emails to her personal account." *Id*. at 337. We also found it relevant that she did not "disclos[e] emails in response to a subpoena" or give "deposition testimony." *Id*.

DiChiara tries to distinguish *Aldrich* by arguing that the employee "never gave the documents to a third party." Appellant Br. at 25 (emphasis omitted). But that's not the relevant question. We ask simply whether an employee was directly involved in an ongoing proceeding. *Booker*, 879 F.2d at 1313; *Aldrich*, 579 F. App'x at 337. And here, the answer is no. DiChiara has presented no evidence of direct participation in a Title VII or ADA proceeding. No lawsuit was ongoing at the time she forwarded the emails. And, even with respect to the later-filed lawsuit, she was never a party. Nor did she participate in a deposition or subpoena. Indeed, she affirmatively renounced any involvement in the relevant lawsuit as a party or witness. So her conduct doesn't qualify.

*Opposition*. DiChiara also argues that her forwarding of confidential internal emails to Deters constituted protected opposition. For the opposition clause to apply, an employee must "challenge[] an employment practice that [s]he reasonably believe[s] was unlawful." *Yazdian v. ConMed Endoscopic Techs., Inc.*, 793 F.3d 634, 645 (6th Cir. 2015). That requires the plaintiff to make two showings: (1) that she actually, subjectively believed that her employer was engaging in discriminatory activity and (2) that such a belief was objectively reasonable in light of the facts. *See id.* at 646; *Weeks v. Harden Mfg. Corp.*, 291 F.3d 1307, 1312 (11th Cir. 2002).

Taking the facts in DiChiara's favor, she may have subjectively believed that SEP's vaccine mandate was unlawful under Title VII or the ADA. At certain points, DiChiara expressed concern that SEP might not grant appropriate religious exemptions. For instance, DiChiara knew that SEP offered religious exemptions to the vaccine policy, but she wanted advice from Deters on whether "[her] medical, scientific document . . . or eventual activism against this mandate would somehow disqualify . . . the legitimacy of [her] religious exemption

request" in SEP's eyes.  R. 50-4, Email, PageID 2735.  And she expressed to Deters that she wanted to gather evidence "to build [her] case if indeed [she was] fired."  *Id.* at 2736.  Later, DiChiara stated in her deposition that she "was not . . . sure of [her] job security" based on "what would happen in terms of [her] religious exemption."  R. 50, DiChiara Dep., PageID 2529.  And in another email to Deters, DiChiara stated that she "fear[ed] some retribution" if her name were revealed in an affidavit.  R. 50-22, Email, PageID 2914.  Based on these facts, DiChiara may have subjectively believed that SEP would either fail to accommodate her religious beliefs or discriminate against her based on religion.

But any such belief still needed to be objectively reasonable.  *Yazdian*, 793 F.3d at 646; *Weeks*, 291 F.3d at 1312.  Objective reasonableness requires a finding that "a reasonable person in the same factual circumstances with the same training and experience as the aggrieved employee would believe that the conduct complained of was unlawful."  *Yazdian*, 793 F.3d at 646 (citation modified).  This inquiry is a matter of law "when no reasonable person could have believed that the facts known to the employee amounted to a violation or otherwise justified the employee's belief that illegal conduct was occurring."  *Id.* (citation modified).

That's the case here.  No reasonable person could have believed that the facts known to DiChiara amounted to a violation of Title VII or the ADA.  DiChiara offers no evidence known to her at the time that would support a reasonable belief that SEP engaged in "any practice made an unlawful employment practice" under Title VII.  42 U.S.C. § 2000e-3(a).  SEP's vaccine policy, which promised religious and medical accommodation, was facially legal.  And DiChiara does not claim that she thought otherwise.  So DiChiara needed some additional basis to think that SEP would act unlawfully.

DiChiara fails to provide that crucial evidence.  DiChiara had not yet applied for a religious exemption and didn't have any information about how SEP would process her request—especially because she intentionally avoided discussing her religious objections with SEP leadership.  In fact, when DiChiara told Deters that she planned to "apply[] for a religious exemption," she "assume[d] [she] w[ould] get it granted."  R. 50-22, Email, PageID 2914.  And she expressed no qualms with any additional preventative requirements (like masking) that she

would face as an unvaccinated employee if SEP did grant her exemption.  Neither does DiChiara claim that she knew of anyone who had been denied an exemption or fired for religious beliefs.

DiChiara points to the fact that, as of September 13, SEP had granted only 10% of the total number of religious exemption requests it eventually approved (76 out of 760).[5]  She frames this as evidence that SEP intended to withhold accommodations.  But DiChiara presents no evidence of the percentage of requests made by September 13 that SEP had granted (or failed to grant).  And SEP offered uncontested testimony that "[they] weren't holding exemptions"; instead, "a whole bunch of these [requests] came in at . . . or immediately prior to the deadline" on September 15.  R. 48, SEP Dep., PageID 2339–40.  What's more, DiChiara does not allege that she knew about this data at the time of her alleged opposition, so it couldn't have formed the basis of any reasonable belief.  *See Yazdian*, 793 F.3d at 646.  Without some objective basis to ground her subjective fear of unlawful activity, DiChiara's conduct did not amount to protected opposition.

Because we find no protected activity, DiChiara's prima facie case fails; so we do not reach the burden-shifting analysis.

B.

DiChiara's retaliation claim under the Kentucky Civil Rights Act (KCRA) also fails.  She concedes that "unlawful retaliation under the KCRA is interpreted consistently with retaliation under federal law."  Appellant Br. at 42–43 (citation modified); *see also Curtis v. Hanger Prosthetics & Orthotics, Inc.*, 101 F. App'x 61, 64 (6th Cir. 2004) ("Under Kentucky law, claims of retaliation are analyzed in the same way as retaliation claims brought under Title VII.").  DiChiara's KCRA claim fails for the same reasons as her Title VII claim.

C.

Next, DiChiara claims that her discharge violated public policy because her termination "was, in part, based on her refusal to waive the attorney-client privilege."  Appellant Br. at 45.

---

[5]SEP testified that 760 out of 785 religious exemptions were ultimately granted (equaling a roughly 97% grant rate).  DiChiara does not contest this number.

Kentucky recognizes a "cause of action for retaliatory discharge" for at-will employees when the discharge is "contrary to a fundamental and well-defined public policy as evidenced by existing law." *Grzyb v. Evans*, 700 S.W.2d 399, 400–01 (Ky. 1985) (citation modified). This tort is "narrow" and functions as an "exception" to the general rule that "at-will employee[s] may be discharged for good cause, for no cause, or for a cause that some might view as morally indefensible." *Marshall v. Montaplast of N. Am., Inc.*, 575 S.W.3d 650, 652 (Ky. 2019) (citation modified). For the exception to apply, the discharge must be "contrary to a fundamental and well-defined public policy as evidenced by existing law," and "[t]hat policy must be evidenced by a constitutional or statutory provision." *Id.* (citation omitted). Whether the exception applies is a "a question of law" rather than a question of fact. *Id.* (citation omitted).

Kentucky has applied this tort only to "terminable-at-will" employees. *See id.* at 651–55 (reviewing cases). And while the Kentucky Supreme Court has not explicitly defined the contours of at-will employment in this context, a few general principles can be drawn from existing law. Most obviously, an employee is at-will when there is no "employment contract." *Carlozzi v. Perkins L. Grp.*, 2007 WL 2893661, at *2 (Ky. Ct. App. Oct. 5, 2007); *accord Steele v. Liberty Life Ins. Co.*, 2009 WL 1562940, at *6 (Ky. Ct. App. June 5, 2009). But an employee may also be at-will if a contract fails to "govern[] the length of the parties' association or the reasons why they may end it." *Hall v. Rag-O-Rama, LLC*, 2021 WL 5782381, at *3 (6th Cir. Dec. 7, 2021) (citing *Shah v. Am. Synthetic Rubber Corp.*, 655 S.W.2d 489, 491 (Ky. 1983)).

DiChiara is not an at-will employee in either sense. Both parties agree that DiChiara had an employment contract with SEP. And it's equally uncontested that her contract set forth the length of the parties' association and the modes of termination. DiChiara's contract initially extended for "[t]hree (3) years" and then "automatically" "extended for additional one year periods unless terminated[] as provided in th[e] Agreement." R. 44-4, Contract, PageID 538. The contract also set forth methods of termination. SEP could terminate DiChiara "immediately" if it found her in violation of a "for-cause" provision and gave her written notice. *Id.* at 528. Otherwise, SEP could terminate DiChiara only if it provided "ninety (90) days prior written notice." *Id.* So, as a contract employee, DiChiara cannot sue for discharge against public policy.

Rather than end our inquiry, DiChiara asks us to extend Kentucky's wrongful discharge tort to contract employees.  She points to other states that extend wrongful discharge torts to contract employees and asks us to apply those rationales here, arguing that there is "no reason that [the Kentucky Supreme] Court would not do so."  Appellant Br. at 47.  But that argument misunderstands this court's role in expanding state law.

While it's true that we must "anticipate how the relevant state's highest court would rule in [a] case," we look to the "binding or persuasive authority" of that court for guidance. *Berrington v. Wal-Mart Stores, Inc.*, 696 F.3d 604, 607, 610 (6th Cir. 2012) (citation omitted). Kentucky has explicitly framed the wrongful discharge tort as "'a narrow public policy exception' to the terminable-at-will doctrine." *Marshall*, 575 S.W.3d at 652 (quoting *Grzyb*, 700 S.W.2d at 401).  It has never extended this tort past those bounds, and DiChiara does not point to any Kentucky cases that provide evidence of a liberalizing impulse in analogous contexts.  But that was her burden.  "[F]ederal courts must be cautious when making pronouncements about state law."  *US Framing Int'l LLC v. Cont'l Bldg. Co.*, 134 F.4th 423, 435 (6th Cir. 2025) (citation omitted).  And we "are in a particularly poor position to endorse a fundamental policy innovation in state law absent some authoritative signal favoring the innovation." *Id.* (citation modified); *see also Berrington*, 696 F.3d at 610 (declining to extend a public policy claim in Michigan employment law).  We see no authoritative signal here.  So DiChiara's claim for expansion falters.

DiChiara's only response is that Kentucky would surely embrace the universal consensus of the other states if confronted with the question.  But, even if this were a sufficient reason to think that Kentucky would follow suit, many states hold that the tort does not extend beyond the at-will context.  *See, e.g.*, *Keeshan v. Eau Claire Coop. Health Ctrs., Inc.*, 394 F. App'x 987, 992–93 (4th Cir. 2010) (per curiam) (finding that South Carolina's public policy tort applies to only at-will employees); *Burns v. Bd. of Trs. of Robeson Cmty. Coll.*, 2013 WL 5309750, at *7 (E.D.N.C. Sept. 19, 2013) ("Under North Carolina law[,] it is well established that the tort of wrongful discharge arises only in the context of employees at will." (citation modified)); *Hermreck v. United Parcel Serv., Inc.*, 938 P.2d 863, 867 (Wyo. 1997) ("Where an employment contract is present, there does not exist any necessity for invoking a separate action for the tort of

retaliatory discharge as to vindicate public policy."); *Haynes v. Zoological Soc'y of Cincinnati*, 652 N.E.2d 948, 951 (Ohio 1995) (noting that an employee cannot bring a tort for discharge against public policy unless she is employed at will). So there is no consensus outside the state. More importantly, DiChiara has not pointed us to any inclination toward expansion within. We therefore have no basis to expand Kentucky law. We leave this tort where we found it—as "'a narrow . . . exception' to the terminable-at-will doctrine." *Marshall*, 575 S.W.3d at 652 (quoting *Grzyb*, 700 S.W.2d at 401). Because DiChiara's employment was not at-will, her claim fails.

D.

Finally, DiChiara argues that SEP breached its contractual agreement when it fired her for cause. But DiChiara violated her terms of employment, so there is no breach of contract. *See Brett v. Media Gen. Operations, Inc.*, 326 S.W.3d 452, 458 (Ky. Ct. App. 2010).

When SEP terminated DiChiara, the accompanying letter listed four reasons why it had cause for her termination:

(1) "By disclosing internal emails . . . to an outside third party without consent or authorization, which emails are the property of SEP, [DiChiara] misappropriated SEP property" under Section 10.2(h). R. 50-44, Termination Letter, PageID 3107.

(2) DiChiara's "afore-described conduct" violated numerous other SEP policies, including the Electronic Forms of Communication Policy, the Confidentiality/Non-Disclosure Agreement, and Sections 103 and 106 of the Associate Handbook. *Id.* These policy violations allowed for termination under Section 10.2(m).

(3) DiChiara's disclosure of the emails "to a law office which already had sued SEP and which was actively preparing to sue SEP again, and which emails related to the subject matter of the lawsuits, constituted disruptive and unprofessional conduct" under Section 10.2(n). *Id.*

(4) DiChiara's disclosure "constituted a breach of [her] duty of loyalty owed to SEP" under Section 10.2(q). *Id.*

The district court found that DiChiara violated all the policies listed in her termination letter, but even a single violation allowed SEP to terminate DiChiara under the contract.

Start with the first reason. Pursuant to SEP policy, internal emails are SEP's property. And under Section 10.2(h) of the Employment Agreement, SEP could terminate DiChiara for

"[m]isappropriating any funds or property of SEP with the exception of incidental medical supplies." R. 44-4, Contract, PageID 529. Based on those terms, when DiChiara forwarded the internal emails from Prichard and Colvin to Deters Law, she misappropriated SEP property and thus could be fired for cause.

DiChiara contends that Prichard's testimony contradicts this analysis because Prichard agreed that no contract violation would occur if an employee "communicate[d] with a lawyer to obtain information about [her] rights, obligations, or duties." R. 45, Prichard Dep, PageID 1840. But we agree with the district court that seeking information about one's rights and forwarding confidential documents to a third party are distinct concepts. Prichard's testimony does not mean that an employee may forward internal documents without violating the terms of the contract. Nor does DiChiara provide any argument for why she needed to forward internal emails in violation of company policy to obtain information about her rights in the first place. *Cf. Jones v. St. Jude Med. S.C., Inc.*, 504 F. App'x 473, 481 (6th Cir. 2012) (noting that plaintiff did not show why she needed to violate company policy).

DiChiara's email use also allowed SEP to terminate her under Section 10.2(m). That section allows termination if SEP determines that an employee has violated its "policies or procedures." R. 44-4, Contract, PageID 528. DiChiara signed an Electronic Communications Policy that she would not use her email to "communicate SEP's official position on any matter" or "[f]or any purpose that is . . . in any way contrary to SEP's best interests." R. 50-45, Electronic Comm. Policy, PageID 3109. And she agreed that "electronic forms of communication . . . may only be used for appropriate business purposes." *Id.* at 3110. "Violation[s]" were "grounds for disciplinary action up to, and including, termination." *Id.* DiChiara also signed a non-disclosure agreement that marked "any electronic or written record" as confidential. R. 50-46, NDA, PageID 3112.

SEP determined that DiChiara violated its communications policies because her email disclosure "was not for appropriate business purposes" and was "contrary to SEP's best interests." R. 50-44, Termination Letter, PageID 3107. DiChiara argues that she did not violate the communications policy because "[d]efendants admitted that engaging in protected activity does not violate SEP or SEH policies." Appellant Br. at 52. But for all the reasons expressed

above, DiChiara has not shown that she engaged in protected activity under state or federal law. And DiChiara has not otherwise shown that SEP acted in bad faith when it determined that she had violated company policies.  So her breach of contract claim fails.

### E.

DiChiara's remaining state claims are contingent on breach of contract, so they fail too. Without a breach, there is no tortious interference.  *See Snow Pallet, Inc. v. Monticello Banking Co.*, 367 S.W.3d 1, 6 (Ky. Ct. App. 2012).  And because we find that SEP terminated DiChiara for cause, there is no basis for granting declaratory relief from the non-compete provision.

* * *

We AFFIRM.